The Wills Corporation v. Commissioner. Alcuin Willenbring and Viola Willenbring v. Commissioner.
Wills Corp. v. Commissioner
Docket Nos. 89712 and 89713.
United States Tax Court
T.C. Memo 1969-36; 1969 Tax Ct. Memo LEXIS 258; 28 T.C.M. (CCH) 174; T.C.M. (RIA) 69036; February 24, 1969, filed *258 Petitioner Alcuin Willenbring was convicted of wilful tax fraud for the years 1954 and 1955. The conviction was affirmed. Willenbring v. United States, 306 F. 2d 944 (C.A. 9, 1962). Willenbring transferred his assets to The Wills Corporation for no consideration, and later converted many of the assets to cash which was deposited in secret bank accounts. The returns for 1953 and 1954 bore only his name and were signed only by him, but joint rates were used in computing the tax due shown thereon, and his wife, Viola, filed no other returns. Petitioner Viola Willenbring was ignorant of her husband's activities during all the years in issue and knew nothing about his business or financial affairs. Alcuin was not present at trial, and although Viola was present, she presented little evidence of any kind. Held: 1. The deficiencies are presumed to be correctly determined by respondent, and petitioners failed in their burden of proving error therein. 2. Additions to tax, other than fraud, for failure to file a declaration of estimated tax in 1953, and filing a substantial underestimation of estimated tax in 1954 are sustained. Petitioners did not meet their burden of proof to show error *259 in respondent's determination thereof. 3. Respondent's determinations of additions to tax for civil fraud in each of the years in question are upheld. Respondent proved fraud by clear and convincing evidence. 4. Although Viola failed to file her own returns for 1953 and 1954, the returns for both years in the name of Alcuin alone and signed solely by him were not joint returns. 5. Since respondent proved that at least part of the income omitted by petitioners was due to fraud with intent to evade tax, the general 3-year statute of limitations is not a bar to assessment of taxes for the years 1953, 1954, and 1955 even though the statutory notice was not mailed until 1960. 6. The Wills Corporation is liable as transferee as determined by respondent. Viola Willenbring, pro se. Eli Blumenfeld, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in the income taxes of Alcuin and Viola Willenbring (Docket No. 89713) for the taxable years 1953, 1954, 1955, and 1958. Further, respondent determined additions to tax on account of fraud for the same years. [1] Respondent also determined additions to tax for 1953 and 1954 for failure *260 to file a declaration of estimated tax. [2] The conglomerate of determinations may be expressed as follows: 175 *11
Additions to Tax
Failure to
Year
Deficiency
Civil Fraud
File Estimate
1953
$71,606.05
$35,803.03
$6,812.71
1954
55,527.26
27,763.63
5,398.07
1955
9,311.11
4,655.56
1958 141.58
70.79 $136,586.00
$68,293.01
$12,210.78
A determination of liability for the same amounts was made by respondent against The Wills Corporation (Docket No. 89712) as transferee of the assets of Alcuin and Viola Willenbring. If the Court should find that the income tax returns for 1953 and 1954 were Alcuin's separate returns and not joint returns as alleged by petitioners, respondent has alternatively asked for increased deficiencies in taxes and additions. Those increases are as follows: *11
Additions to Tax
Failure to
Year
Deficiency
Civil Fraud
File Estimate
1953
$15,740.45
$7,870.22
$1,416.64
1954
14,582.42
7,291.21
1,348.88
Respondent's motion to consolidate the two cases was granted at trial as was his motion to amend his answer in two particulars: First, part of the deficiency determined resulting from capital gain *261 on the sale of certain property located at Long Beach, California, was decreased by respondent's concession that the petitioners' basis in the property was $10,281.43 in lieu of $3,500 as originally found. Second, respondent's determination of an addition to tax for failure to file an estimate for the year 1954 was conceded to be improper. Respondent substituted in its place an addition to tax for that year for filing an estimated return containing a substantial underestimate of tax. [3] The increased deficiency now alleged by respondent for 1954 on account of the addition for substantial underestimate of estimated tax is $3,441.45 under section 294(d) (2). Respondent made jeopardy assessments against Alcuin and Viola Willenbring, and The Wills Corporation, transferee, on June 22, 1960, summarized in his stautory notice of deficiency as follows: Additions
Interest to
Year
Deficiency
to Tax
June 16, 1960
1953
$60,486.48
$30,243.34
$22,692.36
1954
37,508.58
18,754.29
11,633.82
1958 2,517.81
1,258.91
176.65 $100,512.87
$50,256.54
$34,502.83 In his deficiency determination, respondent found it necessary to make certain adjustments in the jeopardy assessments. These *262 adjustments were as follows: *11
Additional Deficiency
Assessment in Excess of Liability
Additions
Additions
Year
Income Tax
to Tax
Income Tax
to Tax
1953
$11,119.57
$12,372.40
1954
18,018.68
14,407.41
1958
$2,376.23
$1,188.12 $29,138.25
$26,779.81
$2,376.23
$1,188.12 176 Essentially, these consolidated cases evolve from respondent's determination that substantial income was omitted by Alcuin Willenbring from his income tax returns during the years in question. Respondent has attempted to reconstruct petitioners' income using the specific item method, corroborating it by using the net worth method. We are faced at first with determining whether income from four sources has in fact been omitted. They are: (1) business receipts from the Club Moderne, (2) interest, (3) dividends, and (4) capital gains. If any of the deficiencies are sustained, the Court must then examine each of the additions to tax determined by respondent. The alleged additions may be categorized according to cause as follows: (1) omission due to fraud with intent to evade tax pursuant to sections 293(b) of the 1939 Internal Revenue Code, and 6653(b) of the 1954 Internal Revenue Code, (2) failure to file an estimate of tax pursuant to section 294(d) (1) (A) *263 of the 1939 Internal Revenue Code, and (3) filing of a substantial understatement of estimated tax pursuant to section 294(d) (2) of the 1939 Internal Revenue Code. We must also decide whether Alcuin and Viola Willenbring filed joint returns in 1953 and 1954, or whether the returns for those years were those of Alcuin alone and whether the statute of limitations bars the assessment and collection of any of the deficiencies determined. Respondent has conceded on brief that if the 1953 and 1954 returns are held to be Alcuin's separate returns, Viola is not liable for deficiencies or additions to taxes for those years. As hereinafter used the term "petitioners" will refer to Alcuin and Viola for the years 1953 and 1954 only if we find that joint returns were filed in those years. It will refer to Alcuin alone for those years whenever used if we determine that the returns for those years were not joint. Finally, we must pass upon the liability, if any, of The Wills Corporation, as the transferee of the assets of Alcuin and Viola Willenbring or as respondent alternatively claims as their alter ego or nominee. Findings of Fact Alcuin and Viola Willenbring were husband and wife and resided *264 at Downey, California, during the taxable years 1953, 1954, 1955, and 1958. All the returns in issue were filed with the district director of internal revenue at Los Angeles, California. Although Alcuin and Viola were divorced in 1966, they were married during the years in issue. Alcuin always filed income tax returns. Viola never filed a return on her own but she, upon occasion, was named therein and executed joint returns. The returns for the years 1953 and 1954 were in the name of Alcuin Willenbring alone and signed only by him. On both returns, however, Alcuin indicated that his wife would not be filing a separate return, and joint income tax rates were used in computing the tax liability reported. Alcuin listed his wife's name on both returns in the appropriate space, and took a deduction for a personal exemption for her. For 1955 and 1958, the returns were in the names of and signed by Viola as well as Alcuin, thereby indicating that the returns were joint for those years. No issue as to this is presented here. Alcuin was born in 1912 in Wisconsin, and attended school there. He was graduated from a university in Minnesota, and taught school for three and a half years following *265 his graduation. He then did some farming. In 1936, he went to California, and became employed as a payroll bookkeeper for a machine company for about three years. From 1939 to 1945, he served as a purchasing agent for an engineering company in California. In 1945, Alcuin borrowed money to go into business for himself. He purchased a bar, but it was not successful, and Alcuin lost his investment in the bar. He subsequently purchased another bar in Long Beach in partnership with an associate. In 1951, the partnership terminated, and Alcuin acquired Club Moderne, a bar and night club in Long Beach. He owned and operated Club Moderne from 1951 until March 31, 1955, when his lease expired. It was the largest bar in Long Beach from 1953 to 1955 and did a thriving and extensive business. After leaving Club Moderne, and at least through the taxable year 1958, Alcuin spent a large part of his time pursuing and acting upon investment opportunities. He maintained several households and incorporated The Wills Corporation. A declaration of estimated tax for 1954 was filed by Alcuin estimating his income tax to be $1,000 for that year. That return was not introduced in evidence but from the district *266 director's records it appears that Alcuin alone filed the estimated 177 tax return and was credited with $1,000 paid thereon. Alcuin was convicted by a jury in the United States District Court for the Southern District of California, Central Division, upon a plea of not guilty, of two counts on an indictment charging wilful income tax evasion for 1954 and 1955 in violation of section 7201 of the 1954 Internal Revenue Code. Both counts charged Willenbring with very substantial omissions of income and underpayments of income taxes due thereon. The conviction was affirmed by the United States Court of Appeals for the Ninth Circuit. Willenbring v. United States, 306 F. 2d 944 (C.A. 9, 1962). Alcuin employed Harold Thorpe as bartender and later manager of the Club Moderne from 1950 until its closing in 1955. Harold worked at the Club from 6 p.m. until 2 a.m. seven days a week. He closed the Club each night when he left. The Club employed 12 to 14 people including waitresses and an orchestra which provided nightly dancing music. When Harold closed the Club he would first reconcile the sales for the day with the tapes from the cash registers. He then wrote down the sales on a daily envelope. *267 He always placed the cash register tapes and the paid-out slips in the daily envelopes which were stored in a locked filing cabinet for Alcuin. He also received breakage slips which when added in with other figures showed the number of bottles of liquor sold on a given night. Finally, he prepared the daily sales slips which showed the breakdown of sales between beer and liquor based on the breakage slips. The total sales shown on the slips were taken from the cash register tapes and the daily envelopes prepared for Alcuin. Thus the information shown on the daily slips reflected the daily sales of the Club. Each of the daily slips reflected the day's sales just as the cumulative slips reflected sales for the entire month. The daily slip of May 13, 1953, reflects the total sales for the first 13 days in May 1953. The daily slips for the first four months in 1953 were not available. Those months were excellent ones for the Club and were at least as good as the last eight months of 1953. Thorpe also prepared the daily summaries showing the daily sales for 1953, 1954, and 1955, which figures were rounded out to the nearest dollar. These summaries were prepared from the information on the *268 daily envelopes and the daily cash register tapes which Thorpe had prepared for Alcuin. The purpose of these summaries was to keep a record available at all times of the business the Club was doing. The information on the daily sales envelopes prepared by Thorpe for Alcuin reflecting the Club's daily sales were always in Thorpe's handwriting. Thorpe never used a printed envelope to record the daily sales, but always used the same plain envelopes. Each envelope was given to Alcuin daily. Thorpe usually noticed them in a wastebasket a few days after giving them to Alcuin. The information on the daily envelopes had been written across the length of the envelope. At a later date, Thorpe gave all the available Club records to the agents of the Internal Revenue Service. Robert Ringler was the accountant for the Club from shortly after it opened until it closed on March 31, 1955. Ringler had done similar work for Alcuin prior to the opening of the Club. Every month Ringler prepared the sales and social security tax reports, maintained disbursement and sales records, and prepared monthly and annual profit and loss statements for the Club. The Club's sales and disbursement records were prepared *269 from check stubs and envelopes given to Ringler by Alcuin. The canceled checks were never available to Ringler, and thus he never had any opportunity to reconcile Alcuin's bank account. Ringler never conducted an audit for the Club. Ringler generally received an entire month's daily envelopes at one time for the Club and returned them to Alcuin after he recorded the information written on the envelopes. The envelopes were mimeographed with lines for sales, miscellaneous income, and miscellaneous pay outs. The envelopes given to Ringler by Alcuin had the sales written across their width. These envelopes never contained any cash register tapes showing the daily sales of the Club. They were obviously not the same records prepared by Thorpe and given to Alcuin each day. The inventory figures used by Ringler in his preparation of the Club's profit and loss statements were provided by Alcuin. The records which Alcuin made available to Ringler never showed any amount for the personal use of Alcuin. Thus the profit 178 and loss statements never contained information as to any drawing account for Alcuin. Although Alcuin had indicated to Ringler that he had accounting experience, he never questioned *270 the profit and loss statements. Ringler did not prepare Willenbring's income tax returns. The profit and loss statements he did prepare were delivered by Alcuin to a public accountant at the end of each year to be used in preparing the returns. An internal revenue special agent was assigned to investigate alleged tax fraud on July 8, 1959. An interview with Alcuin set for October 19, 1959, was postponed at his request until October 26, 1959. Although Alcuin had been asked to bring his books and records, he informed the agent that he could not find them and that they had either been lost or destroyed. The special agent attempted to reconstruct petitioners' income by use of the "specific item" method. He used the "net worth" method to corroborate the reconstruction. Any available original records were used along with third-party records. Using breakage slips, daily sales slips, the daily sales summaries rounded to the nearest dollar, the daily sales envelopes for March 1954 and all other records available, petitioners' income was reconstructed. Such reconstruction indicates that the actual bar receipts, the bar receipts reported by petitioners, and the omitted bar receipts of the Club *271 Moderne for 1953, 1954, and 1955 were as follows: 1953
1954
1/1/55 to
3/31/55
Actual Club receipts
$230,669.21
$190,946.00
$38,389.10
Club receipts reported on petitioners' returns 123,063.89
97,871.39
20,190.00
Unreported Club receipts $107,605.32
$93,074.61
$18,199.10 Those summaries are based upon the agent's schedules prepared as mentioned and records provided by Thorpe showing the daily sales of the Club for the relevant years. Although no Club records were available for the first four months in 1953, those months were reconstructed by computing the average monthly ratio of the last eight months' sales in 1953 to the last eight months of 1954 and applying this ratio to the sales of the first four months in 1954. The average monthly ratio of 1953 to 1954 sales was 120 percent. Thus the above results were the product of applying this ratio to the sales of the Club for the first four months of 1954. The computation was based on the fact that these months were very good months for the Club and at least as good as the last eight months' sales in 1953. During the years in issue, Joseph J. Bevins operated a bar near the Club Moderne. The bar, called Trader Al's Windjammer, was owned by Bevins' corporation, *272 Al-Jalo, Inc. In 1954, Al-Jalo borrowed $3,000 from Alcuin, $2,125 in 1955, and $3,000 in 1957. Interest was to be paid at the rate of 10 percent. The interest paid by Al-Jalo to Alcuin on the three notes was as follows: Year
Amount
1954
$225.00
1955
304.19
1958
150.00
None of the interest was reported on petitioners' income tax returns. All of the payments on the loans were made by checks of Al-Jalo, Inc., and were paid directly to Alcuin when he would drop by the bar owned by Al-Jalo, Inc. Petitioner Alcuin Willenbring purchased certain property at 2354 Olive Avenue, Long Beach, California, in June of 1953, and had a basis which respondent now concedes was $10,281.43. Viola executed a grant deed conveying her interest in the above property to Alcuin on August 7, 1953. On March 28, 1955, Alcuin executed a grant deed for this property to Violet Tanski, one of his friends. On August 29, 1955, Alcuin sold the Olive Avenue property to Perry and Evelyn Lindsey. At that time, title to the property was in the name of Tanski. On August 18, 1955, Tanski signed an "escrow memoranda" authorizing the proceeds of the above sale to be paid to Alcuin. She then signed the escrow instructions as one of the *273 sellers of this property to Lindsey. She then executed a deed granting the 2354 Olive Avenue property to Lindsey. Accordingly, Lindsey executed a promissory note in favor of Alcuin for $11,250 in connection with the purchase of the Olive Avenue property. Although a gain of $2,158.21 resulted from the sale, Alcuin did not report the sale of the property, nor any gain resulting therefrom in his 1955 return. Viola was unaware of the sale or that she ever had an interest in the property. 179 When called into the Internal Revenue Service offices, Alcuin told the agents that he never sold the property to Tanski, that she had no interest in the property, and that he was ignorant as to why the property was in her name. He further stated at that time that he did not know why he failed to report the sale of the Olive Avenue property on his income tax return. Petitioner realized other capital gains in addition to that received from the abovementioned sale. Taken altogether their capital gains during the years in question may be summarized as follows: Year
Amount
1953
$ 50.80
1954
3,232.04
1955
13,185.74
1958
-0-
During the ensuing years, the Lindseys made payments on the note directly to Alcuin's account *274 at the Farmers and Merchants Bank at Long Beach, California. The Lindseys paid petitioners interest in the amounts of $223.06 and $607.23 in 1955 and 1958, respectively, none of which was ever reported by petitioners on their income tax returns. During the year 1954, Alcuin received three checks from Home Savings and Loan Association for interest totaling $349.50. Petitioners received an additional $21.22 interest from Home in 1958. None of this interest was reported by petitioners on their income tax returns. Petitioners received interest income from Sylvan Hess in 1955 in the amount of $180. This was not reported by petitioners on their return for 1955. Petitioners received interest from Linus H. Willenbring in 1958 in the amount of $183.44. This interest was not reported by petitioners on their 1958 income tax return. Thus petitioners received and failed to report on their income tax returns the following amounts of interest income: Year
Amount
1954
$574.50
1955
707.25
1958
961.89
Included in the dividends received and omitted from their return in 1955 were checks received and endorsed by Alcuin from: Investment Trust of Boston
$450
Gulf Interstate Gas Company
200
Twentieth Century Fox Film Com- pany
200
San Jose Water Works
50
Added *275 in with other dividend income, petitioners received but failed to report the following amounts of dividend income: Year
Amount
1953
$344.98
1955
1,617.53
1958
60.00
As of January 1, 1952, petitioners' net worth was between $4,000 and $5,000. Neither of the petitioners had ever received any gifts or inheritances. Petitioners' net worth and net worth increases for the calendar years ended December 31, 1952 through December 31, 1955, are as follows: 12/31/52
12/31/53
12/31/54
12/31/55
Net Worth
$65,281.46
$154,475.48
[1] $245,157.77
$258,314.69
Net Worth - Previous Year 65,281.46
154,475.48
[1] 245,157.77
Net Worth - Increase $ 89,194.02
[1] $ 90,682.29
$ 13,156.92
Petitioners incurred and paid the following personal expenses during the relevant years. 12/31/53
12/31/54
12/31/55
Federal Income Tax
$ 1,481.84
$ 4,156.11
$ 1,938.16
Estimated Tax
1,000.00
Personal expenses 15,000.00
15,000.00
15,000.00
Total personal and nondeductible living expenses $16,481.84
$20,156.11
$16,938.16
*276 180 The annual $15,000 for personal expenses was added to petitioners' net worth increases for 1953, 1954, and 1955 for the following reasons: 1. During the relevant years, Alcuin was supporting two families in addition to his own family. 2. Alcuin purchased eight to ten thousand dollars worth of furniture, paying cash, in 1953 for Betty Lohse. 3. During the relevant years, Alcuin paid all of the expenses necessary to maintain the household of Betty Lohse and her family while she was living with them at 2354 Olive Avenue (owned by Alcuin). 4. During the pertinent years, Alcuin lived lavishly and spent a great deal of cash in expensive restaurants and night clubs. He wore expensive clothing and supplied Betty Lohse with her clothing and a gardener to take care of her property. 5. Alcuin purchased a new Cadillac or Lincoln each year. The net incomes omitted by petitioners from their 1953, 1954, and 1955 income tax returns, based on the specific item and net worth methods of reconstructing income, are as follows: Reported
Specific
Net
Year
On Returns
Item
Worth
1953
$19,114.31
$107,975.70
$86,561.55
1954
12,789.14
95,265.13
98,048.26
1955
72.38
[1] *277 27,116.75
[2] 30,022.70
Alcuin wanted to leave the United States permanently. In 1960, he asked Betty Lohse to move to Mexico with him. During the summer of 1959, Alcuin exhibited $85,000 in cash to Betty Lohse. The money was mostly in $100 bills, although bills of lower denomination were also mixed in. Frequently Alcuin went on vacation and left Thorpe completely in charge of Club Moderne. Alcuin instructed Thorpe to purchase cashier's checks with the cash from the Club during these periods. Thorpe never placed any proceeds in the Club's checking account, rather he let Alcuin take care of such matters. The principal addresses of The Wills Corporation at the time the income tax returns and the petition were filed were Long Beach and Downey, California. The corporate returns were all signed and filed by Alcuin. Petitioners had the following bank accounts during the years 1952 to 1961: Bank
Number of Accounts
Security First National Bank in Downey
One
Home Savings and Loan Association
Five
Farmers and Merchants Bank
Two (one in name of Wills Corporation)
Provident and Tradesman Bank and Trust Company in Pennsylvania
One
Bank of America in Downey
One
First National Bank in Phoenix, Arizona
One
First Western Bank
Four (three at Long Beach and one at Downey)
When *278 questioned about his bank accounts by the Internal Revenue Service, Alcuin misrepresented both the locations and the number of accounts. The income tax returns for petitioners during the relevant years were prepared by John J. Yearwood and included the information in the annual profit and loss statements prepared by Ringler for the Club. The Wills Corporation was organized on April 1, 1955, primarily to make investments in real estate. No stock has ever been issued by the corporation. All of the properties acquired in the name of the corporation were paid for by moneys received by Alcuin upon the sale of his securities. Alcuin had liquidated his stock, bonds, and other securities in order to purchase land and buildings in the corporation's name. Alcuin owned and controlled The Wills Corporation. He held full authority in the corporation and was the only one that could sign any checks. Alcuin never received any consideration from the corporation for the transfer of the cash, land and buildings to the corporation. The balance sheet of the corporation showed a liability of $75,000 to Alcuin. Even Alcuin, however, recognized the entry as erroneous, and no debt in fact existed to him from *279 the corporation. The corporation purchased a 14-unit apartment building in its own name at Long Beach, California. The cash necessary to 181 consummate the transaction was drawn from Alcuin's personal fund. All the assets purchased by Alcuin for the corporation were, like the building, paid for in cash. The building was sold by the corporation in 1959 for $140,000. The corporation received a cashier's check for $24,050.47, and a promissory note for $110,000 from the purchaser. The cashier's check for $24,050.47 was endorsed by Alcuin and deposited in his personal account at Home Savings and Loan Association. Alcuin then negotiated a loan to the corporation of $55,000 from Farmers and Merchants Bank using the $110,000 promissory note as security. A cashier's check from the bank for $55,000 dated October 23, 1959, was made out to the corporation, and endorsed by Alcuin for the corporation. Alcuin then used the endorsed cashier's check to purchase a cashier's check made to himself from the bank for $55,000. By October 23, 1959, Alcuin was converting all assets in his and the corporation's name to cash. On October 26, 1959, Alcuin deposited $86,500 in his account at the Bank of America *280 in Downey. Of that amount, $85,000 was then transferred to the First National Bank in Phoenix, Arizona. In July 1960, Alcuin withdrew the $85,000 by cashier's check from the First National Bank in Phoenix, Arizona, and negotiated this check at Farmers and Merchants Bank at Long Beach, California, where he requested and received $85,000 in $100 bills. In October 1959, Alcuin made inquiry about having one of the officers at the First National Bank in Arizona issue a letter of credit to various banks in Italy or Spain. The corporation owned certain property located at Long Beach, California, on Florida Avenue. On May 26, 1960, the property was sold and the corporation received a check for $27,290.65. The check was deposited in the corporation's bank account. On June 13, 1960, Alcuin withdrew $25,000 from the corporation's account in the form of a cashier's check in his name. In a manner similar to this transaction, Alcuin frequently obtained large amounts of cash and cashier's checks. On June 20, 1960, agents of the Internal Revenue Service attempted to enforce collection of the jeopardy assessments against Alcuin, Viola, and The Wills Corporation. Subsequent investigation showed that *281 petitioners' assets were negligible and that further efforts to collect the assessed taxes would be fruitless. Such a determination was reached only after every reasonable effort was made to collect the taxes. After discovery of the transfer by Alcuin to The Wills Corporation of all his assets followed by rapid conversion of the assets into cash, a jeopardy assessment was made against the corporation and attempts were made to collect the assessment. Efforts to collect the taxes from Alcuin were continued. Continuing attempts to recover the $85,000 in $100 bills Alcuin had received in July of 1960 from Farmers and Merchants Bank proved to be futile. During the period April 1, 1956 to June 1956, petitioners transferred assets to the corporation with a value of $186,159.62, and did not receive any consideration for these transfers. Petitioners' net worth on December 31, 1956, including the value of the assets transferred without consideration to the corporation was as follows: Cash in Banks
Farmers and Merchants Bank
$3,834.42
Security First National Bank
351.11
Home Savings and Loan Association
303.67
Promissory Notes Receivable
Al-Jalo, Inc.
1,250.00
Lindsey, Percy, and Evelyn
10,780.53
Willenbring, Linus H.
3,987.21
Real Estate
Residence - 11102 Marbel Street, Downey
15,000.00
Corporate Investments
Other than The Wills Corporation
10,195.71
Assets transferred to The Wills Corporation 186,159.62
Net Worth as of December 31, 1956 $231,862.27
*282 As of April 1, 1956, the deficiencies in tax, penalties and interest due from petitioners was $212,956.13. This liability was based on a determination that petitioners filed joint income tax returns for the years 1953, 1954, and 1955. In light of our 182 conclusion that the 1953 and 1954 returns were not joint, as hereinafter indicated, this liability is substantially increased. After the transfer of assets by petitioners to the corporation in 1956, petitioners had a net worth deficiency of $167,253.48. Since petitioners' home was covered by homestead, it is not part of petitioners' assets under California law when determining insolvency. Therefore, petitioners' actual net worth deficiency was at least $182,253.48. Ultimate Findings of Fact Petitioners filed joint income tax returns for 1955 and 1958, but the returns filed for 1953 and 1954 were not joint and were for Alcuin Willenbring alone. Petitioners omitted the following income from their income tax returns: 1953
1954
1955
1958
Club Receipts
$107,605.32
$93,074.61
$18,199.10
Capital gains [1]
n1 25.40
n1 1,616.02
6,592.87
Interest
574.50
707.25
$ 961.89
Dividends 344.98
1,617.53
60.00 $107,975.70
$95,265.13
$27,116.75
$1,021.89
At *283 least part of the income omitted from petitioners' tax returns for 1953, 1954, 1955, and 1958 was due to fraud. Petitioner Alcuin Willenbring failed to file a declaration of estimated tax due for 1953, and his declaration of estimated tax due for 1954 substantially underestimated tax due for that year. Petitioners transferred their assets to The Wills Corporation without consideration at a time when their tax liabilities were in arrears. Such transfer rendered petitioners insolvent, and was done for the purpose of hindering collection of the taxes. Opinion Deficiencies As Modified The determination of deficiencies by respondent carries a presumption of correctness and petitioners must bear the burden of proving the determination erroneous. Jacob C. Ehrlich, 31 T.C. 536 (1958). Petitioners did not present any evidence at trial to show error in respondent's determinations. Alcuin was not present at trial, and Viola's testimony dwelt upon her lack of involvement with Alcuin's activities. During the investigations conducted by respondent's agents prior to the issuance of the statutory notice of deficiency, Alcuin insisted that his books and records were either lost or destroyed. Hence, *284 none of Alcuin's books or records was ever available for audit. Respondent was forced to reconstruct petitioners' income for the years in question through the specific item and net worth methods of reconstruction. Resorting to such methods of reconstruction is fully justified in determining the taxable net income when adequate books and records are not available to the respondent. See sec. 446(b), I.R.C. 1954. Lawrence Sunbrock, 48 T.C. 55 (1967). The methods used by respondent to reconstruct petitioners' income have been recognized and approved by the various courts of the United States in both criminal and civil cases, whereby the taxable net income of the taxpayers may be determined, in the absence of adequate accounting books and records. Holland v. United States, 348 U.S. 121 (1954); Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court. Where, as shown in our Findings of Fact, the petitioner has failed to supply books and records of his transactions, the use of these methods to determine taxable net income is fully justified. Each of the items appearing in the schedules set forth in our findings was carefully and meticulously documented *285 and explained by respondent's agents. Thus we need not rely entirely on petitioners' failure to sustain their burden of proof, or on the presumption of correctness which attaches to respondent's determination. A careful examination of the detailed evidence submitted by respondent convinces us that the deficiencies, as adjusted, have been correctly determined by respondent. Additions To Tax (Other Than For Fraud) Respondent made a determination that petitioners failed to file declarations of 183 estimated taxes due for 1953 and 1954 and are therefore liable for the additions to the taxes under section 294(d)(1)(A) of the 1939 Internal Revenue Code. The pertinent parts of this section provide that: (d) Estimated Tax. - (1) Failure to file declaration or pay installment of estimated tax. - (A) Failure to file declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due *286 but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment. For the purposes of this subparagraph the amount and due date of each installment shall be the same as if a declaration had been filed within the time prescribed showing an estimated tax equal to the correct tax reduced by the credits under sections 32 and 35. Subsequently, respondent conceded that petitioners did file a declaration of estimated tax for 1954. The estimate was $1,000. However, pursuant to the provisions of section 272(e) of the 1939 Code, respondent in an amendment to his answer, asked for an increased deficiency for an addition to tax for a substantial underestimate of estimated income tax for 1954. The record reflects however that Alcuin alone filed the estimated tax return and was credited with the $1,000 paid; Viola filed no such return and was not required to do so. Section 6654(h) of the 1954 Code dictates that section 294(d) of *287 the 1939 Code maintains its vitality through the taxable calendar year 1954. Section 294(d)(2) of the 1939 Code therefore applies to petitioners' taxable year of 1954. It provides for an addition to tax following a substantial underestimate of estimated tax. The material part of the section is as follows: SEC. 294. ADDITION TO THE TAX IN CASE OF NONPAYMENT. * * * (d) Estimated Tax. - * * * (2) Substantial underestimate of estimated tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a), or 66 2/3 per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer *288 makes a timely payment of estimated tax within or before each quarter (excluding, in case the taxable year begins in 1943, any quarter beginning prior to July 1, 1943) of such year (or in the case of farmers exercising an election under section 60(a), within the last quarter) in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year (or in the case of any such farmer, or in case the fifteenth day of the third month of the taxable year occurs after July 1, on July 1 of the taxable year) but otherwise on the basis of the facts shown on his return for the preceding taxable year. In the case of taxable years beginning prior to October 1, 1950, and ending after September 30, 1950, the additions to tax prescribed by this subsection shall not be applicable if the taxpayer failed to meet the 80 per centum and 66 2/3 per centum requirements of this paragraph by reason of the increase in normal tax and surtax on individuals imposed by section 101 of the Revenue Act of 1950. In the case of taxable years beginning *289 prior to November 1, 1951, and ending after October 31, 1951, the additions to tax prescribed by this subsection shall not be applicable if the taxpayer failed to meet the requirements of this paragraph by reason of the increase in rates of tax on individuals imposed by the Revenue Act of 1951. Thus we must determine whether petitioners' tax liabilities are subject to additions for failure to file a declaration of estimated tax for 1953 and/or filing of a substantial underestimate of estimated tax for 1954. The burden of proof with respect to these issues rests with petitioners. See Dorothy L. Sutherland, 32 T.C. 862 (1959); J. K. Vise, 31 T.C. 220 (1958), affirmed 278 184 F. 2d 642 (C.A. 6, 1960); Rene R. Bouche, 18 T.C. 144 (1952). Petitioners presented no evidence to rebut the presumption that they failed to file a declaration of estimated tax for 1953. Therefore, we hold that they have failed to sustain their burden and are liable for the addition to the tax pursuant to section 294(d)(1)(A). Similarly, the record shows that petitioners filed a declaration of estimated tax for 1954 of $1,000. Since the estimated tax was less than 80 percent of the actual tax liability, the addition *290 to the tax under section 294(d)(2) of the 1939 Code applies, and petitioners are liable therefor. DeWitt M. Sherwood, 20 T.C. 733 (1953). Additions To Tax (For Civil Fraud) Respondent determined additions to tax in each of the years in question due to civil fraud. Sections 293(b)[4] and 6653(b)[5] *291 of the 1939 and 1954 Codes dicate that if any part of the omitted income was due to fraud, then petitioners are liable for certain additions to tax. Respondent carries the burden of proving fraud with intent to evade tax through clear and convincing evidence. Secs. 7454(a) of the 1954 Code and 1112 of the 1939 Code. Luerana Pigman, 31 T.C. 356 (1958); Arlette Coat Co., 14 T.C. 751 (1950). We think respondent has amply sustained his burden as to each of the years involved in these proceedings. An issue of fraud presents a question of fact which can be determined only after a thorough examination of all the facts and circumstances in each case. The mere failure to report income is not, by itself, sufficient to prove fraud. Cefalu v. Commissioner, supra.It is not necessay for the respondent to prove the precise amount of the deficiency in order to establish fraud. Rather, respondent must prove that at least some part of the deficiency for each year in question was due to fraud with intent to evade taxes. W.A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). Substantial and consistent understatement of income is at least strong evidence of fraud. Merritt v. Commissioner, 301 F. 2d 484 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court. Further, the intelligence and experience of the taxpayer are important in determining the *292 existence of fraud. E.S. Iley, 19 T.C. 631 (1952). Attempts at disguising and concealing, ownership of property also lead the Court toward the existence of necessary fraudulent intent. Furnish v. Commissioner, 262 F. 2d 727 (C.A. 9, 1958), affirming and remanding on another point 29 T.C. 279 (1957); Remmer v. United States, 205 F. 2d 277 (C.A. 9, 1953). Destruction and alteration of records are further elements to be considered as a measure of fraud. Spies v. United States, 317 U.S. 492 (1943). Failure to disclose multiple bank accounts has also been held to be an indicium of fraud. Klassie v. United States, 289 F. 2d 96 (C.A. 8, 1961). Thus, the indicia of fraud which have been used here and in other courts as proof of the necessary intent are present in this case. Our Findings of Fact have revealed consistent and substantial understatement of income. Alcuin was knowledgeable in accounting and bookkeeping methods. He attempted to conceal and disguise ownership of property by juggling the record title. Although it was known that he kept records, he refused to produce them for respondent's agents. He kept many bank accounts, and refused to reveal their locations when requested to *293 do so. Taken altogether these elements form clear and convincing evidence of a fraudulent intent to evade tax. We therefore hold that petitioners are liable for additions to tax as determined by respondent. Joint and Several Liability Respondent made a determination in his statutory notice to petitioners that they filed joint income tax returns in all the years in issue. Viola, the only petitioner present at trial, contends that the returns 185 filed in 1953 and 1954 were not joint returns, but rather were Alcuin's separate returns. If these returns were joint, as respondent determined, then Viola's liability for the deficiencies as well as the various additions to tax will be joint and several with Alcuin's. Sec. 51(b)(1) of the 1939 Code; [6]sec. 6013 (d)(3) of the 1954 Code; [7] *294 Furnish v. Commissioner, supra.
The determination of the Commissioner that the returns were joint is prima facie correct and the burden of proving error therein rests with petitioners. Arlington F. Brown, 24 T.C. 256 (1955). Our Findings of Fact reveal that although the returns were filed in the name of Alcuin alone and signed only by him, joint rates were used. Even so, Viola testified that during the years in issue Alcuin filed the returns for both of them, and she never filed a return on her own. The nature of the return is a reflection of the method selected by the parties to report the income. The question of how that income is reported is one of fact, and the intentions of the parties are major considerations in ascertaining that fact. If the parties intended to avail themselves of the econnomic benefits of the joint return, then their liability will be joint and several. But the intent to claim the benefits must be mutual. If indicium of mutual intention *295 is not apparent on the face of the return, then we may look to other sources. Myrtle O. Calhoun, 23 T.C. 4 (1954). We find the facts in Elsie S. Bour, 23 T.C. 237 (1954), to be similar to those in the present action. In that case, the Federal income tax returns for the years 1941 through 1944 were filed in the name of petitioner's husband alone. Although the printed instructions at the bottom of page 1 on each of those returns required the signatures of both husband and wife if the return were to be joint, none of the returns was signed by petitioner. In each of them, an exemption was taken for petitioner as the wife, and it was stated that she was not filing a separate return for that year. Petitioner did not file a return in any of the years in issue in that case. The Court held that since petitioner did not intend to file Federal income tax returns jointly with her husband, the requisite mutual intent was lacking. In Myrtle O. Calhoun, supra, the Court refused to find a joint return had been filed where the returns were without petitioner's name on the caption or without her signature. Again the Court grounded its decision on its inability to discover a mutual intent to file a *296 joint return. In the present case, Viola neither filed returns in 1953 or 1954, nor did she sign the returns filed by Alcuin. Although the joint rates were used on both returns to compute the tax liability, we cannot say that Alcuin's computations indicate an intent on Viola's part to file a joint return. Without such a mutual intent, we cannot find that Viola filed any returns jointly with her husband, and conclude that on the record presented here that the returns for 1953 and 1954 were not joint. We are aware of our holding in Joseph Carroro, 29 B.T.A. 646 (1933), indicating that when a husband files an income tax return without objection from his wife who herself filed no return, the return will be presumed to have been filed with the tacit consent of his wife. However, the facts there distinguish the case from this one. More recent cases have looked to an actual intent rather than a mere tacit consent. In the present case, Viola did not have income of her own which Alcuin included in the return he alone signed and the nature of the relationship between Viola and Alcuin and the other evidence of record convinces us that she had no intent to file joint returns with him. Although *297 she herself filed no returns, the record reflects that she was under no obligation to do so. We hold that the returns in question for 1953 and 1954 were not joint returns and that therefore Viola cannot be held liable for the deficiencies and additions determined for those years. Alcuin alone filed those returns and he is 186 solely liable for the deficiencies and additions in issue. Transferee Liability Respondent alleges that The Wills Corporation is liable for all taxes and additions to tax as transferee of Viola and Alcuin. Wills was incorporated on April 1, 1955, and although no stock was ever issued, Alcuin owned and controlled the corporation. Alcuin admitted to the Commissioner's agents that all the property in the name of the corporation was paid for in cash by him or supplied to Wills by him. The evidence presented at trial supports that admission. Alcuin further admitted that he never received any consideration for the transfers, and Viola testified that she never received anything from Wills. Wills had no outstanding debts to anyone. All its assets were purchased with cash supplied by Alcuin or given to it by Alcuin. Wills had no other assets than those which were contributed *298 directly or indirectly by Alcuin. The various transfers by petitioners to Wills, discussed in our Findings of Fact, rendered petitioners insolvent. As of December 31, 1956, petitioners' net worth was $231,862.27, excluding tax liabilities. Reducing this figure by $15,000, the value of their residence, their actual net worth was $216,862.27. [8] Petitioners then transferred $186,159.62 of assets to Wills. Thus, petitioners' net worth after the transfer was $30,702.65. Their tax liability at that time was $212,956.13. That amount must be considered as a liability even though undetermined at the time. Leon Papineau, 28 T.C. 54 (1957). Thus, petitioners' debts ($212,956.13) exceeded their assets ($30,702.65) by $182,253.48. Pursuant to California law, [9] insolvency prevails when debts exceed assets. Such insolvency was caused by petitioners' intentional transfers to Wills. The record indicates that the transfers by petitioners to Wills, along with extensive use of cash and cashier's *299 checks, were for the purpose of hindering, delaying, and defrauding respondent's agents in their attempts to collect taxes from petitioners. By October 1959, Alcuin was actively converting all his personal assets and those in the name of the corporation to cash. All of the land and buildings were being sold by Alcuin personally or by Wills. The proceeds went directly to Alcuin, or indirectly by having a cashier's check issued to Wills and then using that check to purchase another for the same amount in Alcuin's name. During the summer of 1960, Alcuin deposited the cash from the liquidated assets in various banks. After unsuccessful attempts to procure letters of credit addressed to European banks, he converted one cashier's check into $85,000 in $100 bills. Although respondent's agents attempted to locate the cash to satisfy tax liabilities, it was never found. Continued efforts to locate petitioners' assets proved to be futile. In June 1960, after the discovery that petitioners' assets were being converted and that Alcuin was attempting to leave the country, a jeopardy assessment against petitioners was made by respondent. After the discovery that the transfers to Wills were to hinder *300 and delay the respondent's agents, a similar assessment was made against Wills. Section 6901 of the 1954 Code provides for liability of transferees. The material parts of that section provide: SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, Estate, and Gift Taxes. - (A) Transferees. - The liability, at law or in equity, of a transferee of property - (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * * (b) Liability. - Any liability referred to in subsection (a) may be either as to the amount of tax shown on a return or as to any deficiency or underpayment of any tax. Pursuant to section 6902 of the 1954 Code, respondent has the burden of proving that Wills is liable as the transferee of 187 petitioners' assets. To discharge his burden respondent must show that there was a gratuitous transfer of assets from the transferor to the transferee and *301 that the transferor was either insolvent at the time of, or rendered insolvent by, the transfer. Arlington F. Brown, supra; J. Warren Leach, 21 T.C. 70 (1953). We have found that the transfers by Alcuin were for the purpose of hindering and delaying the Government in its attempts to seek a satisfaction of the outstanding tax liabilities. Under these conditions, transferee liability is established irrespective of transferor's insolvency. Bartmer Automatic Self Service Laundry, Inc., 35 T.C. 317 (1960). William Wiener, 12 T.C. 701 (1949). Respondent has drawn a clear picture which includes the following elements: unsatisfied liability of the transferor, a transfer of assets and their value to the transferee, no consideration for the transfer, transferor rendered insolvent by the transfer, assets transferred to hinder and delay the Government, and the present assets of the transferor cannot satisfy his liabilities. Under such conditions, we feel that all the requirements of section 6901 of the 1954 Code have been met. Wills is therefore liable as transferee of Alcuin's assets. Statute of Limitations In their petitions before this Court, petitioners alleged that the statute of limitations *302 prevents assessment of deficiencies or penalties for the years 1953, 1954, and 1955. Pursuant to sections 275(a) and 6501(a) of the 1939 and 1954 Codes, the Government has three years to begin proceedings for assessment and collection of the tax by mailing a notice of deficiency. The statutory notice was mailed in August 1960. One exception to the general 3-year statute of limitations is found in sections 276(a) and 6501(c)(1) of the 1939 and 1954 Codes. The material parts of these sections provide that: SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. - (1) False Return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. We have already found and concluded that at least part of the omissions of income for 1953, 1954, and 1955 *303 was due to fraud with intent to evade tax. Pursuant to the above-cited statutes, the general statute of limitations is not a bar to the assessment of the taxes for those years. Decisions will be entered under Rule 50. Footnotes
1. Pursuant to sec. 293(b), I.R.C. 1939, and sec. 6653(b), I.R.C. 1954↩. 2. Pursuant to sec. 294(d)(1)(A), I.R.C. 1939↩.
3. Pursuant to sec. 294(d) (2), I.R.C. 1939↩.
1. During 1954, petitioners received stock warrants from Armour and Company which they sold in 1955 for a gain of $1,260.62. This increases their 1954 net worth, and decreases their net income for 1955 under the net worth method. Respondent concedes that this adjustment is necessary.↩
1. This includes adjustment for capital gain on the Olive Avenue property, and readjustment of other capital gains. 2. See footnote 1 to table on page 18.↩
1. Taxable portion only.↩
4. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * * (b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2)↩. 5. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).
6. SEC. 51. INDIVIDUAL RETURNS. * * * (b) Husband and Wife. - (1) In General. - A husband and wife may make a single return jointly. Such a return may be made even though one of the spouses has neither gross income nor deductions. If a joint return is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. ↩
7. SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. * * * (d) Definitions. - For purposes of this section - * * * (3) if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several.↩
8. The residence was covered by homestead and thus should be excluded in figuring solvency under California law. Carter v. Carter, 130 P. 2d 186, 55 Cal. App. 2d 13↩ (D.C.A. 1, 1942). 9. Civil Code Section 3439.02(a)↩.